RECEIVED
IN LAKE CHARLES, LA.
OCT -2 2015
TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DOCKET NO. 2:13 CV 2508 |
| VS. | : | JUDGE MINALDI |
| 102.871 ACRES OF LAND, MORE OR LESS, LOCATED IN CAMERON PARISH, LOUISIANA, THE LOUISIANA JETTY AND LIGHTERING COMPANY OF NEW ORLEANS, *et al.* | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the court is the United States' Motion for Partial Summary Judgment (Rec. Doc. 82), State of Louisiana's Motion for Partial Summary Judgment (Rec. Doc. 85) and Motion for a Hearing (Rec. Doc. 86).

In the United States' Motion for Partial Summary Judgment (Rec. Doc. 82), the Government seeks an order granting partial summary Judgment against Louisiana Jetty and Lightering Company of New Orleans (Louisiana Jetty) 1) denying Louisiana Jetty's Second Affirmative Defense questioning the Government's decision to acquire a fee estate rather than an easement on the condemned land as not justifiable; 2) denying Louisiana Jetty's claim to ownership of adjoining lands formed along the shore of Sabine Pass; and 3) affirming the United States' navigation servitude over the adjoining lands formed in the waterway of Sabine Pass.

The State of Louisiana's Motion for Partial Summary Judgment (Rec. Doc. 85) seeks a ruling that, as a matter of Louisiana law, Sabine Pass is an arm of the sea and the State requests a hearing

(Rec. Doc. 86) on this motion.

## Summary Judgment Standard

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine dispute of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies this burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at 323). In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no genuine issue for trial, and thus a grant of summary judgment is warranted, when the record as a whole "could not lead a rational finder of fact to find for the non-moving party..." *Id.*

### I. United States' Motion for Partial Summary Judgment (Rec. Doc. 82)

Louisiana Jetty owned a tract of land on the east bank of the Sabine Pass from 1884 until some or all of it was condemned in 2013. A large tract of alluvial buildup adjoining Louisiana Jetty's property formed as a result of a combination of manmade and natural processes ("accretion"). The ownership of the accretion could increase just compensation and entitle

Louisiana Jetty to severance damages, the law requires that the extent of Louisiana Jetty's ownership be determined.[1]

The ownership of the accretion is disputed by Louisiana Jetty and the State of Louisiana ("State"). The State has claimed ownership under the Louisiana Constitution as well as La. C.C. art. 505, which states, "[I]slands, and sandbars that are not attached to a bank, formed in the beds of navigable rivers or streams, belong to the state." Louisiana Jetty also claims ownership of the accretion under the U.S. and Louisiana Constitutions and Article 499, which states in relevant part, "[A]ccretion formed successively and imperceptibly on the bank of a river or stream, whether navigable or not, is called alluvion" and belongs to the owner of the bank.

Louisiana Jetty asserts that the accretion fronts several tracts owned by different persons and those persons should have been made parties to this suit. This argument was dismissed by Magistrate Judge Kay in her Written Reasons in Rec. Doc. 68, Motion to Dismiss for Failure to Join Necessary Parties.[2]

### A. Louisiana Jetty's Second Affirmative Defense questioning the Government's decision to acquire a fee estate.

In the Defendant's Second Affirmative Defense, Louisiana Jetty asserts that "the United States [should] be called upon to justify taking [fee] title to the property rather than taking an easement, servitude, or similar right constituting less than full ownership."[3] The Government contends that the merits of the nature or extent of the property condemned in furtherance of a public purpose is not reviewable by the court and the United States is entitled to judgment as a matter of

---

[1] *See United States v. 8.41 Acres of Land*, 680 F.2d 388, 392 n.5 (5th Cir. 1982). Severance damages are measured by the diminution in value of any non-taken or "remainder" parcel caused by the taking.

[2] Louisiana Jetty filed a motion to stay, which was denied. (Rec. Doc. 35), as well as a motion to dismiss the title trial (Rec. Doc. 83) which was denied By Magistrate Judge Kay on August 18, 2015 (Rec. Doc. 122).

[3] Answer to Complaint in Condemnation, With Affirmative Defenses, 4 (Doc. 16).

3

law.

Determinations of whether and what to condemn are to be made by Congress or those to whom Congress has delegated authority.[4] Likewise, whether a particular condemnation is necessary to fulfill the purpose for which Congress granted such authority is a question left to the discretion of the agency to which that authority is granted.[5] And "[t]he judgment exercised by the designated officials . . . constitute[s] an administrative and legislative decision not subject to judicial review on its merits."[6]

Thus, "[w]hen the government exercises its power of eminent domain through formal condemnation, the nature and extent of the interests to be acquired are in the government's discretion. Once the government specifies those interests unambiguously in a complaint in condemnation, a court has no power to increase or decrease them."[7]

A court may then inquire only "whether the use for which private property is authorized by the legislature to be taken, is in fact a public use". Shoemaker v. United States, 1893, 147 U.S. 282, 298, 13 S.Ct. 361, 390, 37 L.Ed. 170. The court may ask in this inquiry whether the authorized officials were acting in bad faith or arbitrarily or capriciously by condemning given land. There is no allegation that the disposal of dredge on the subject property in support of navigation is an invalid public purpose,[8] just that the taking of fee rather than a lesser interest is not necessary to fulfill that purpose. Nor is there any allegation that the government acted in bad faith or arbitrarily or capriciously by condemning them. United States v. 101.88 Acres of Land, More or Less, Situated

---

[4] Berman v. Parker, 348 U.S. 26, 32-33 (1954).

[5] United States v. Carmack, 329 U.S. 230, 242-43 (1946).

[6] Id.

[7] United States v. 101.88 Acres of Land, 616 F.2d 762, 767 (5th Cir. 1980).

[8] Id.

4

in St. Mary Parish, State of La., 616 F.2d 762, 767 (5th Cir. 1980). Therefore, the court agrees with the Government that the issue Louisiana Jetty calls into question is not one that can be decided by this court.

### B. Louisiana Jetty's claim to ownership of adjoining lands formed along the shore of Sabine Pass.

Louisiana Jetty asserts that the Government is, for the first time in this case, now arguing that the Sabine Pass is not a river but an "arm of the sea," rendering the banks thereof not subject to private ownership. The Government and the State of Louisiana contend that Louisiana owns the disputed tract of land lying between Louisiana Jetty's original parcel and the current eastern bank of the Sabine Pass, the accretion. Louisiana Jetty argues that the Government's position is incorrect and the Government's motion on this issue should be denied.

A related issue is raised in the State's Motion for Partial Summary Judgment (Rec. Doc. 85). The State alleges that Sabine Pass is a saline, tidal-exchange pass in extreme southwest Louisiana that connects the Sabine Lake to the Gulf of Mexico. The mouth of the Sabine Pass opens directly into the Gulf of Mexico. There are no intermediate bodies of water between the Gulf of Mexico and Sabine Pass. The State urges the court to find, as a matter of law, that the Sabine Pass is an arm of the sea.

The issue of ownership is pivotal to the resolution of this dispute. The parcel of land adjacent to the condemned property separates the condemned property from the Sabine Pass. Louisiana Jetty claims that this piece of land ("the Disputed Remainder Portion") was formed through the process of accretion, making it alluvion that belongs to the shore of the Sabine Pass by operation of law, if and only if, the Sabine Pass is classified as a river or stream, as opposed to a bay or arm of the sea.

Article 499 of the Louisiana Civil Code states:

> Accretion formed successively and imperceptibly on the bank of a river or stream, whether navigable or not, is called alluvion. The alluvion belongs to the owner of the bank, who is bound to leave public that portion of the bank which is required for the public use.
>
> The same rule applies to dereliction formed by water receding imperceptibly from a bank of a river or stream. The owner of the land situated at the edge of the bank left dry owns the dereliction. Acts 1979, No. 180, § 1, eff. Jan. 1, 1980.

Article 500 of the Louisiana Civil Code states:

> There is no right to alluvion or dereliction on the shore of the sea or of lakes. Acts 1979, No. 180, § 1, eff. Jan. 1, 1980.

Louisiana Jetty argues that the Government should be estopped from raising this argument since it has allegedly judicially admitted that the Sabine Pass is a river and this new position that it is an arm of the sea constitutes unfair surprise.

A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them. Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention. A statement made by counsel during the course of trial may be considered a judicial admission if it was made intentionally as a waiver, releasing the opponent from proof of fact. *McCullough v. Odeco., Inc.*, No. CIV.A. 90-3868, 1991 WL 99413, at *2 (E.D.La. May 30, 1991). By contrast, an ordinary evidentiary admission is "merely a statement of assertion or concession made for some independent purpose," and it may be controverted or explained by the party who made it. *McNamara v. Miller*, 269 F.2d 511, 515 (D.C.Cir.1959). "A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be controverted or explained by the party." *Keller v. United States*, 58 F.3d 1194, 1199 n. 8 (7th Cir.1995) (quoting John William Strong, *McCormick on Evidence*, § 254 at 142 (1992)). *Martinez v. Bally's Louisiana, Inc.*, 244

6

F.3d 474, 476 77 (5th Cir. 2001).

There is no evidence that the United States intentionally waived any legal argument regarding the classification of Sabine Pass. Accordingly, the Government is not now estopped from raising the "arm of the sea" argument.[9]

Now, the court must address whether there is competent summary judgment evidence establishing an arm of the sea, or if this is a factual issue that should be held for trial. In Buras v. Salinovich, 154 La. 495, 97 So. 748 (1923), the court stated that the term "the sea" as used in La.C.C. art. 451 (La. C.C. 1870) has "reference to the Gulf Coast, and to the lakes, bays and sounds along the Gulf Coast." 97 So. at 750. Additionally, according to Louisiana jurisprudence the word "sea" applies to "arms of the sea," which are defined as bodies of water in the vicinity of the open Gulf and which are directly overflowed by the waters of the Gulf. Buras v. Salinovich, supra; Morgan v. Negodich, 40 La.Ann. 246, 3 So. 636 (1888).

The first step in determining ownership of land formed by accretion attached to a property bounded by a body of water is to classify the body of water in which the accretion forms. Such accretion, if formed "successively and imperceptibly," under Louisiana law is referred to as "alluvion."[10] As stated by the Louisiana Supreme Court, "the pertinent inquiry is *where* the alluvion accumulated."[11]

> Alluvion which forms along the bank of a river or a stream belongs to the owner of the land adjacent to the bank. Alluvion which forms along the shore of a body of water that is not a river or a stream belongs to the State. Thus, to determine the ownership of alluvion,

---

[9] Louisiana Jetty's allegation of surprise is not persuasive. In the Minutes of the Court (Rec. Doc.122, [88]), Magistrate Kay addressed this argument and provided Louisiana Jetty with the opportunity to depose the experts on this issue. Louisiana Jetty declined to do so.

[10] La. C.C. art. 499.

[11] Davis Oil Co. v. Citrus Land Co., 576 So. 2d 495, 500 (La. 1991) (emphasis in original).

a court must first determine the bank or shore upon which it has accumulated, and then it must classify the area upon which the alluvion accumulated as either the bank of a river/stream or the shore of a lake, bay, or arm of the sea.[12]

The bank of a river is defined by Louisiana law as "the land lying between the ordinary low and ordinary high stage in the winter."[13] A river terminates where its delta forms: "A delta by definition forms at the mouth of a river, where the river intersects with a larger body of water that is not a river or stream."[14] The "seashore" refers to "the space of land over which the waters of the sea spread in the highest tide during the winter season."[15] "'[A]rms of the sea' ... are defined as bodies of water in the vicinity of the open Gulf and which are directly overflowed by the waters of the Gulf."[16]

Seashore is defined as "the space of land over which the waters of the sea spread in the highest tide during the winter season"[17] and includes "arms of the sea," which are defined as bodies of water in the immediate vicinity of the open Gulf and which are directly overflowed by the waters of the Gulf.[18] A river has current that flows and well-defined banks, channel, and bed.[19] A "stream" is a broader term that means a flowing body of water, including a river, that does not necessarily

---

[12] Id. (Internal citation omitted).

[13] La.C.C. art 456.

[14] Davis Oil Co., 576 So. 2d at 500.

[15] La.C.C. art. 451.

[16] Davis Oil Co., 576 So. 2d at 501.

[17] La Civ. Code art. 451; La. Civ. Code art. 500.

[18] Davis Oil Co. v. Otrus Land Co., 576 So.2d 495, 501 (La.1991).

[19] State v. Richardson, 72 So. 984, 987 (La. 1916).

have well-defined banks.[20] The main determining factor for a river or stream is a current sufficient to carry accretion-causing sediment. The Louisiana Supreme Court said that "a body of water through which a current flows or runs with such capacity and velocity and power as to form accretions is characterized as a river or stream, depending upon all attending circumstances, for the purpose of applying the rules of accretion and dereliction set forth in ... the Civil Code."[21]

In the case at bar, none of the following facts is in dispute: (1) the Sabine and Neches Rivers empty into the northern portion of Sabine Lake, where they form a delta; (2) there are no natural channels flowing from the rivers' deltas through Sabine Lake to the Pass; (3) Sabine Pass is an outlet of Sabine Lake and is connected to the open Gulf of Mexico; (4) Sabine Pass is over-washed by the tides of the Gulf of Mexico; (5) the currents in the Pass are bidirectional and generated by tides of the Gulf; and (6) the water in the Pass is salt water and its shores are lined by saltwater marshes. The court notes that Louisiana Jetty offers no contested facts. The emphasis of their argument is on interpretation of the facts pursuant to existing jurisprudence.

Louisiana Jetty bears the burden of proving its ownership of the adjoining land. To meet its burden, Louisiana Jetty must prove that Sabine Pass is classified as a river under Louisiana law.[22] In support of this position, Louisiana Jetty argues that its expert, Dr. Mark Kulp, "testified that Sabine Pass is a river" in his deposition.[23] The Government asserts that Dr. Kulp offers no specific basis for any characterization of Sabine Pass as a river. When asked regarding specific criteria that may serve as a basis for the legal characterization of Sabine Pass, Dr. Kulp could express no

---

[20] State v. Placid Oil Co., 300 So.2d 154, 160 (La. 1973), on reh'g (June 10, 1974).

[21] Id at 162.

[22] Davis Oil Co., 576 So 2d at 500.

[23] Memorandum in Opposition to the United States Motion for Partial Summary Judgment, 17 (Rec. Doc. 101).

definitive opinion:

> Q. And where is the sediment [in the Sabine Pass] coming from?
> A. There are several sources. It's fundamentally within the river.
> Q. You said fund - -
> A. Meaning that sediment within the river water column could derive from upstream and downstream sources.
> Q. Okay. Do you have an opinion as to whether the sediment, the majority of the sediment, is coming from upstream or downstream?
> A. I do not have an opinion on that.
> Q. Do you have an opinion as to the amount of sediment that's coming from upstream?
> A. I do not.
> ...
> Q. So a tidal pass flows in a large body, right? Did you say that?
> A. A tidal pass connects open marine environment to some other type of environment, such as a freshwater river like the Sabine River or a bay behind a set of barrier islands.
> Q. Where does the Sabine River end? A. I don't know.[24]

When questioned about whether the Sabine River flows into the Sabine Pass,

Dr Kulp opined:

> [The Sabine River] flows down into Sabine Pass. Okay? At which point we would tend to think of it as an estuary environment where there's modification and input and control both from marine sources and marine processes.[25]

An environment controlled by marine sources and processes is, by definition, not a river.[26]

Yet, if one continues reading pages 157-172 or Dr. Kulp's deposition, he clearly opines that the Sabine Pass is a river in his opinion.

---

[24] Deposition of Mark Kulp, 90:17-91:8, 163:1-9 (May 11, 2015) (Excerpts attached to Rec. Doc. 101-2).

[25] Id. at 164:7-16.

[26] According to Dr. Kulp, a river has "[f]reshwater ... [and] directed flow"; whereas a tidal pass is characterized by "marine influence." Kulp Depo. at 162:13-15; See Byrnes, Mark, Supplemental Report, 5-11 (section entitled, "Is Sabine Pass a Tidal Inlet (Marine) or River (Fluvial)?") (Rec. Doc. 82-15).

10

The United States retained Mark R. Byrnes, Ph.D. as its primary expert.[27] Dr. Byrnes is a Principal Coastal Scientist at Applied Coastal Research and Engineering, Inc. He holds a Ph.D. in Oceanography (1988) from Old Dominion University. Dr. Byrnes is familiar with the Condemned Property, and physically inspected it in February 2015.[28] Dr. Byrnes' reports contain his expert opinions in this case (Byrnes Decl., ¶ 9). Dr. Byrnes' ultimate opinion is that "Sabine Pass is a tidal inlet and not a river" (Byrnes Decl., ¶ 10).

In formulating his opinion, Dr. Byrnes considered information in existing technical reports and papers, historical maps and charts, high resolution aerial imagery, and dredging records. It is an accepted practice within the field of process geomorphology to reasonably rely on those sources in formulating technical opinions (Byrnes Decl., ¶¶ 7, 8). In his declaration, Dr. Byrnes itemized the opinions contained in his reports:

* Sabine Pass is a tidal inlet formed by marine sedimentation associated with formation of the Chenier Plain coast east and west of Sabine Pass;

* Foraminiferal analysis Sabine Lake sediment, Sabine Pass sediment, and sediment of the adjacent Gulf of Mexico supports geologic evidence that Sabine Pass is a tidal inlet and not a river;

* Sediment transport along the coast over the past 3,000 years accumulated south of the entrance to Sabine Lake where tidal currents associated with flow into and out of the Lake created a boundary to alongshore coastal flows, resulting in net deposition at and adjacent to the entrance, forming the tidal inlet Sabine Pass; and

* Modern water level measurements and current measurements show that water movements in Sabine Pass are primarily controlled by tides.

---

[27] There are no objections filed to any of the expert's qualifications.

[28] Rec. Doc. 85, Exhibit C, Declaration of Dr. Byrnes, with expert reports dated April 6, 2015 and June 10, 2015.

The United States retained Michael D. Blum as its rebuttal expert. Dr. Blum is the Scott and Carol Ritchie Distinguished Professor in the Department of Geology at the University of Kansas. He holds a Ph.D. in Geography (1992) from the University of Texas at Austin. Dr. Blum is familiar with the Condemned Property.[29]

In formulating his opinion, Dr. Blum considered information in existing technical reports and papers, historical maps and charts, high resolution aerial imagery, and dredging records. The United States submits that it is an accepted practice within the field of geomorphology and coastal geology to reasonably rely on these sources in formulating technical opinions. (Blum Decl. ¶¶ 6, 7). In his declaration, Dr. Blum itemized the opinions contained in his reports:

- Water within Sabine Pass has sufficient salinity to support marine fauna and salt marsh

- The dominant processes within Sabine Pass are currents associated with daily tidal cycles and wind-generated waves

* There is no evidence that the Sabine Pass shoreline or bottom adjacent to the Condemned Property is shaped by river floods and sediment transported with the Sabine and Neches Rivers

- The Sabine and Neches fluvial (river) and deltaic (bayhead deltas) environments have been identified as being north of Sabine Lake.

- The presence of Sabine Lake dampens the effect of river discharge, and process within Sabine Pass are dominated by wind- and tide-generated directional currents that reflect its primary tidal exchange function.

Reviewing the testimony of the three experts summarized above, the court finds that there are genuine issues of material fact that preclude this court from finding, as a matter of law, that the Sabine pass is, in fact, an arm of the sea. This issue will be resolved at the trial now set for October 13, 2015 and the request for a hearing prior to that date on these issues will be denied.

---

[29] See Exhibit B, Declaration of Dr. Blum, with his expert reports dated June 11, 2105 and June 17, 2015.

12

### C. United States' navigation servitude over the adjoining lands formed in the waterway of Sabine Pass.

There is no dispute regarding the origins of the spoil island. The island emerged from the water bottom as dredge was cast into the open waters proximate to the Louisiana Jetty property.[30] And after the island emerged, the Corps of Engineers deposited spoil on the island, such that the hydraulic gradient carried the spoil dredged from the nearby channel down slope towards the Louisiana Jetty property.[31] As dredging operations continued over time, the area opposite the channel expanded to meet the shore at the Louisiana Jetty property as spoil continued to flow down grade towards the shoreline through the effects of weathering and the direct placement of dredge.[32] There is no dispute that the Corps of Engineers erected containment levees in the 1960s after the island attached. These levees made the connection of the island permanent. At this point, the Louisiana Jetty property was land-locked without access to the Pass.[33]

In its natural condition before dredging operations began in the 1930s, the area currently comprising the adjoining land was open water.[34] The placement of dredge spoil from maintenance and improvement of the navigation channel has been continuously placed on the area of the adjoining land ever since.[35]

---

[30] Government's Statement of Undisputed Facts at ¶ 4-7.

[31] Id. at ¶ 6.

[32] Id.

[33] Id. ¶ 8

[34] Id. at ¶ 5

[35] Id. at ¶ 8

The Commerce Clause confers a unique position upon the Government in connection with navigable waters. 'The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of the navigable waters of the United State. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress.' Gilman v. City of Philadelphia, 3 Wall. 713, 724—725, 18 L. Ed. 96 (1866). This power to regulate navigation confers upon the United States a 'dominant servitude,' FPC v. Niagara Mohawk Power Corp., 347 U.S. 239, 249, 74 S.Ct. 487, 493, 98 L.Ed. 686 (1954), where extends to the entire stream and the stream bed below ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject. United States v. Chicago, M., St. P & P.R. Co., 312 U.S. 592, 596—597, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941); Gibson v. United States, 166 U.S. 269, 275—276, 17 S.Ct. 578, 580, 41 L.Ed. 996 (1897). Thus, without being constitutionally obligated to pay compensation, the United States may change the course of a navigable stream. State of South Carolina v. State of Georgia, 93 U.S. 4, 23 L.Ed. 782 (1876), or otherwise impair or destroy a riparian owner's access to navigable waters, Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578 (1897); Scranton v. Wheeler, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126 (1900); United States v. Commodore Park, Inc., 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945), even though the market value of the riparian owner's land is substantially diminished. United States v. Rands, 389 U.S. 121, 122 23, 88 S. Ct. 265, 266 67, 19 L. Ed. 2d 329 (1967).

The navigational servitude of the United States does not extend beyond the high-water mark. Consequently, when lands are taken by the Government, just compensation must be paid. But 'just

as the navigational privilege permits the Government to reduce the value of riparian lands by denying the riparian owner access to the stream without compensation for his loss, it also permits the Government to disregard the value arising from this same fact of riparian location in compensating the owner when fast lands are appropriated.' United States v. Rands, 389 U.S. 121, 123 24, 88 S. Ct. 265, 267, 19 L. Ed. 2d 329 (1967); United States v. Virginia Elec. & Power Co., 365 U.S. 624, 629, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1961).

The United States has absolute authority to regulate all navigable waters in the interest of commerce and the power to regulate confers a dominant navigable servitude over all areas below the mean high water mark of navigable waterways.[36] As the Supreme Court has established, surrender of a navigation servitude must be "unmistakable."[37] The mere act of filling a portion of a waterway cannot be construed as an intent to terminate the navigation servitude.[38] This is particularly true in a case where the land created by spoil disposal in a navigable waterway was done in support of interstate commerce.[39]

The Government asserts that there is no dispute that the high-water mark of Sabine Pass in its natural state prior to the Corps of Engineers' placement of dredge in the waterway encompassed the adjoining land. And the origins of the adjoining land are directly attributable to the Corps of Engineers exercise of the navigation servitude. The Corps to this day exercises this dominant right on the adjoining land by continuing to place on it dredge from maintaining the navigation channel

---

[36] United States v. Rands, 389 U.S. at 122-23.

[37] United States v. Cherokee Nation of Okla., 480 U.S. at 707.

[38] 33 C.F.R. 329.13 (2015).

[39] United States v. 49.79 Acres, 582 F. Supp at 374.

in Sabine Pass. The Government argues that, given its continued use in service of navigation, the creation of the adjoining land cannot be construed as relinquishing the servitude in that area of the waterway.[40]

The Corps of Engineers' right to continue using the adjoining land as a dredge spoil placement area is not disputed in this case. The adjoining land exists within the area of the original waterway of the Sabine Pass. Based upon the facts provided, the court finds that the United States' dominant servitude over the area of the adjoining land has never been relinquished. Therefore, the United States is entitled to judgment as a matter of law that it has a navigation servitude over the disputed adjoining land.

## Conclusion

In summary, the court's ruling is as follows:

The United States' Motion for Partial Summary Judgment (Rec. Doc. 82) will be GRANTED IN PART and DENIED IN PART. Louisiana Jetty's second affirmative defense will be denied and the United States' navigation servitude over the adjoining lands formed in the Sabine Pass waterway will be affirmed. The United States' and the State of Louisiana's request (Rec. Doc.

---

[40] See 33 C.F.R. § 329.13. Permanent changes of the shoreline configuration result in similar alterations of the boundaries of the navigable waters of the United States. Thus, gradual changes which are due to natural causes and are perceptible only over some period of time constitute changes in the bed of a waterbody which also change the shoreline boundaries of the navigable waters of the United States. However, an area will remain "navigable in law," even though no longer covered with water, whenever the change has occurred suddenly, or was caused by artificial forces intended to produce that change. For example, shifting sand bars within a river or estuary remain part of the navigable water of the United States, regardless that they may be dry at a particular point in time. SOURCE: **51 FR 41251**, Nov. 13, 1986, unless otherwise noted.

85) for Partial Summary Judgment denying Louisiana Jetty's claim to ownership of adjoining lands formed along the shore of Sabine Pass and seeking ruling a that, as a matter of Louisiana law, Sabine Pass is an arm of the sea IS DENIED. This issue will be resolved at the trial on October 13, 2015. The State of Louisiana's request for a hearing on this issue prior to the trial date IS DENIED.

Lake Charles, Louisiana, this  Oct  day of September, 2015.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE